Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7471 | **DATE** | 3/20/2002 |
| **CASE TITLE** | DUPAGE HABITAT FOR HUMANITY, INC. vs. VILLAGE OF GLENDALE HEIGHTS | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Opinion And Order. Judgment is entered in favor of defendant, Village of Glendale Heights.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAR 21 2002 date docketed |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | date mailed notice |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office — mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DUPAGE HABITAT FOR HUMANITY, INC., an Illinois not-for-profit corporation, ) ) ) Plaintiff, ) ) v. ) ) VILLAGE OF GLENDALE HEIGHTS, ) an Illinois municipal corporation; et al., ) ) Defendants. ) | No. 98 C 7471<br><br>Judge John W. Darrah |

## OPINION AND ORDER

### PROCEDURAL HISTORY

Plaintiff, DuPage Habitat for Humanity ("Habitat"), brings this action against Defendant, the Village of Glendale Heights ("Village"), for an alleged violation of equal protection pursuant to 42 U.S.C. § 1983. Plaintiff alleges that conduct by the Village deprived Plaintiff, on behalf of the class of individuals as proposed home buyers, of its Fourteenth Amendment right to equal protection of laws.

Habitat filed suit against the Village pursuant to 42 U.S.C. § 1983, alleging that a Right of First Refusal and Option Agreement ("Agreement") entered into by the parties was unconstitutional and unenforceable and that the exercise of the option by the Village was a denial of equal protection. Further, Habitat claimed that the Option Agreement was void as the product of coercion by the Village against Habitat.

The Village answered that the proposed re-zoning to a lesser density of property owned by Habitat, and the Agreement which compromised and settled the dispute between the parties was a

constitutionally valid exercise of the Village's authority as a reasonable means to reduce the concentration of low income housing. The Village also denied the Option Agreement was a result of coercion by the Village.

Trial of the issues was by the Court without a jury. The parties presented exhibits and testimony of several witnesses, including two expert witnesses.

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact.

## FINDINGS OF FACT

In June 1996, Habitat purchased twenty lots in the Village of Glendale Heights. The twenty lots are within a single subdivision of the Village, known as the Reskin Subdivision. One lot is located on Fox Avenue. Eight of the lots are located adjacent to one another on a single block of Liberty Drive. The remaining eleven lots consist of nine contiguous lots on Jill Court and Fullerton Avenue and four adjacent lots on Jill Court, one lot away from the nine contiguous lots. Across the street is a 200-plus apartment complex that provides Section 8 subsidized housing to some tenants. The homes Habitat planned to build in the Village constituted low-income housing.

In July 1996, Habitat sought to obtain financing through the Illinois Housing Development Authority ("IHDA"). In the submission, Habitat stated that it intended to build, sell, and provide financing for thirteen single-family homes and sell seven remaining lots at market price. The home

building would occur in stages; four homes in 1997, four to six homes in 1998, and the remaining homes by 2000. All of the homes would be sold to employed families whose household income was less than 50% of the median family income for DuPage County. Habitat desired IHDA's assistance to reduce Habitat's financial encumbrance of paying $4,000 a month in interest payments on an existing mortgage, and IHDA had grant money available to give Habitat.

That same month, Richard Nogaj ("Nogaj"), Habitat's president, notified the Village of the proposed project. The Village notified its residents through correspondence of Habitat's intent to build new homes within the Village. Village President, Ben Fajardo ("Fajardo"), invited the public to participate in discussions regarding Habitat's development at the Village Committee of the Whole meeting scheduled on August 1, 1996.

On August 5, 1996, Fajardo invited Nogaj to attend the August 15, 1996 Village Board meeting to address concerns of the residents and to provide clarification and explanation of the proposed project. Nogaj was unable to attend the Village Board meeting. At the meeting, residents objected to the proposed development and subsequently submitted petitions to Village officials stating their objections.

On September 17, 1996, IHDA informed Habitat that, prior to its consideration of its loan for approval, a thirty-day public-notice period would be required.[1] The IHDA also informed Habitat that comments would be sought from public officials and that it was Habitat's responsibility to respond to those comments.

On October 3, 1996, the Village passed Resolution No. 96R-42, entitled "A Resolution in

---

[1] Although funding was already provided for the project by a private bank, Nogaj chose to pursue funding from the IHDA.

3

Objection to the Grant Fund Application." This formal objection was served to IHDA on October 4, 1996. The Village's objections were not based upon a desire to interfere with Habitat's goals of providing housing for low-income families but, rather, upon its concern regarding the concentration and centralization of such housing. Low-income housing had previously been established in the Village. In this case, the Village was opposed to the number of low-income housing units Habitat planned to build within the intended specific area because this would result in a concentration of low-income housing contrary to reasonable city planning and its promotion of scattered-site housing.

On October 10, 1996, the Village sent Nogaj notice that it intended to re-zone Habitat's twenty lots from R-2 Medium Density Single Family Residential District to R-1 Low Density Single Family Residential District. The proposed change in zoning by the Village would not have resulted in the denial of Habitat to build the intended number of homes. Instead, it would reduce the concentration of so improved lots in that area from 20 to 13.

On October 14, 1996, Nogaj tendered its written response to IHDA regarding the Village's objections. On November 15, 1996, Nogaj attended the meeting of the members of the Board of IHDA and represented that he had not reached an agreement with the Village concerning the proposed development. Subsequently, IHDA required the Village to reach an agreement with the Village regarding the proposed development prior to approval for funding.

On February 6, 1997, Habitat and the Village entered into a "Right of First Refusal and Option Agreement" ("Agreement"). In accordance with the terms of the Agreement, four building permits were issued to Habitat, and Habitat constructed homes on all four of the lots.

The Court heard testimony regarding the creation of the Agreement. The Agreement was the result of negotiations between the parties, including discussions and exchange of proposed draft

4

agreements. Habitat was represented throughout by an attorney who made changes to certain written proposals and reviewed and approved the final Agreement for Habitat. The final written Agreement was executed by the parties on February 6, 1997.

The Agreement provided, in pertinent part, that Habitat desires to construct homes consistent with its mission to provide affordable housing to low-income home buyers and that the Village finds the need of orderly planning, development, and construction of housing for low-income buyers. The Agreement further provided that the Village agreed to issue building permits for the four lots to Habitat. It further states that, "Habitat, in consideration of proceeding with the immediate construction ... does hereby desire to grant to the Village an option to purchase certain [l]ots." The Option Agreement also granted the Village the exclusive right of first refusal and an option to purchase any lots that Habitat chose to sell anytime between June 1, 1998 and prior to December 31, 1998.

Through the Option Agreement, Habitat was allowed to build on less restrictive R-1 zoned property, and the Village gave up its right to re-zone the property. Habitat applied for and was issued building permits for four of the lots. Habitat then constructed and sold four homes built on these lots.

In April 1998, the Village waived its right of first refusal, and Habitat sold seven of the remaining lots, six on Liberty Drive and one on Fox Avenue, to a builder for a profit. Thereafter, nine lots remained subject to the Right of First Refusal and Option Agreement. Seven of the nine lots on Jill Court and Fullerton Avenue are contiguous; and the other two lots, adjacent to each other, are one lot away from the other seven.

On September 1, 1998, Habitat submitted four applications for building permits for four of

the subject lots. On October 15, 1998, the Village passed Ordinance No. 98-59, which authorized the execution of the notice of the exercise of the option and the acquisition of the nine vacant lots. In November 1998, the Village notified Habitat that it was exercising its rights under the Option Agreement to purchase the remaining nine lots pursuant to the ordinance.

The Village presented an expert witness regarding Habitat's proposed construction of low-income homes. The Habitat proposal would have resulted in a concentration of low-income housing in the Jill Court area, which would present a serious potential of adverse consequences in the development and redevelopment of orderly land use there. The Agreement and the exercise of the option by the Village promoted the concept of scattered-site housing and alleviated the concentration of low-income housing. The approach of the Village in this regard was consistent with the policy of United States Department of Housing and Urban Development and the DuPage County Comprehensive Plan for land use and development.

Habitat's expert offered a contrary opinion, *i.e.*, the proposed development of the nine lots would not represent a concentration of low-income housing in the area and would not have a negative impact on surrounding homes nor adversely affect orderly development of the subdivision. On cross-examination, he admitted that, in reaching his conclusion regarding the proposed nine low-income homes, he did not take into consideration in any way the 200-unit apartment complex across the street, which contained section 8 tenants. This was because the exact number of these low-income families was not known.

## CONCLUSIONS OF LAW

The court has federal question jurisdiction over the plaintiff's claim (28 U.S.C. § 1331 and 1343(a)(3)), and venue is proper pursuant to 28 U.S.C. § 1391.

6

The Village has challenged Habitat's standing to challenge the constitutionality of the Village's action. The minimum constitutional requirements for standing include: (1) plaintiff has personally suffered some actual or threatened injury as a result of alleged illegal conduct by the defendant, (2) the injury can be fairly traced to the challenged action, and (3) the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United*, 454 U.S. 464, 472 (1982).

Habitat has standing to bring the present cause of action. Habitat's alleged injuries include the entering into the Option Agreement through coercion, inability to build the homes it had planned to build, and the potential requirement that the remaining lots be sold to the Village. These injuries can be fairly traced to this action, and such injury would be redressed by a favorable decision.

Habitat's claim of denial of equal protection involve application of the following principles.

'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1989), quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918).

The plaintiff must establish discriminatory intent or purpose to prove a violation of the equal protection clause. *Village of Arlington Heights v. Metropolitan Hous. Dev Corp.*, 429 U.S. 252, 265 (1977) (*Village*). Plaintiff must demonstrate that the governmental officials had the requisite intent to purposefully discriminate against a particular, identifiable class of persons. *Village*, 429 U.S. at 265.

Habitat has failed to meet its burden of proof that the Village intended or its purpose was to

7

discriminate against Habitat or low-income housing. The evidence clearly proved that the Village held an appropriate concern for the harmful effects of a heavy concentration of low-income housing. The subject lots were in the immediate vicinity of a 200-unit apartment complex that provided low-income housing. The Village's attempt to re-zone the property would not have prevented Habitat from building low-income housing in the Village. Instead, it would have decreased the concentration of such housing - a legitimate government interest.

One of three standards of review are applied to an equal protection claim. Strict scrutiny is applied where fundamental rights are at issue or the discrimination is based on the plaintiff's membership in a "suspect class". Under strict scrutiny, a statute will only be upheld if it narrowly tailored to serve a compelling state interest. Intermediate scrutiny is applied where discrimination is based on the plaintiff's gender or illegitimacy. Under intermediate scrutiny, a statute will only be upheld if it is substantially related to a sufficiently important government interest. Claims that do not involve rights or discrimination based on grounds other than membership in a suspect class, gender, or illegitimacy are analyzed under rational basis test - is the government action rationally related to a legitimate governmental purpose. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439-42 (1985). Financial need alone does not identify a suspect class for purposes of equal protection. *Maher v. Roe*, 432 U.S. 464, 471 (1977).

Habitat and potential low-income residents are not members of a suspect class and purchasing a home is not a fundamental right for purposes of constitutional protection. Accordingly, Habitat's action is reviewed under the rational basis test.

Where neither a fundamental right nor a suspect class is involved, there is a presumption of validity and the party attacking the rationality of the action has the burden of establishing the absence

of such rationality. *See Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993). To overcome the presumption of rationality, a plaintiff must meet a heavy burden of showing that the challenged governmental action was "completely ludicrously arbitrary". *Pontarelli Limousine, Inc. v. City of Chicago*, 929 F.2d 339, 342 (7th Cir. 1991). The "rational basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993), quoting *FCC v Beach*, 508 U.S. 307, 313 (1993).

Habitat has failed to meet its burden of proof that the Village's actions were not rationally related to its legitimate government interest of limiting the concentration of low-income housing and promoting scattered-site housing. The Village has a legitimate government interest of limiting the concentration of low-income housing and promoting scattered-site housing. The Village entered into the Option Agreement to preserve its legitimate government interest of limiting the concentration of low-income housing and promoting scattered-site housing. The Option Agreement was rationally related to the Village's legitimate government interest of limiting the concentration of low-income housing and promoting scattered-site housing. Furthermore, the Village's exercise of its right of first refusal and option to purchase the property from Habitat was, likewise, in furtherance of legitimate government interest of limiting the concentration of low-income housing and promoting scattered-site low-income housing. Accordingly, the Village's actions regarding the Option Agreement and the enactment of the ordinance which exercised the option were reasonable and, therefore, a constitutional exercise of its authority in the protection of a legitimate government interest.

Habitat has asserted the defense of coercion as to the Option Agreement. Agreements that are entered into from a decision that is voluntary, deliberate, and informed are enforceable. *See*

9

*Town of Newton v. Rumery*, 480 U.S. 386, 391, 398 (1987).

The execution of the Option Agreement by Habitat was an informed, deliberate, and voluntary act by Habitat and was not the result of coercion by the Village on Habitat. Habitat was not in any way coerced into the agreement and freely and voluntarily chose to resolve the dispute in this manner rather than litigate the constitutional issues it now asserts. Habitat had the assistance of counsel throughout the negotiation and acceptance of the Option Agreement. Further, pursuant to the Option Agreement, Habitat will be paid more than its purchase price for the lots subject to the option. Prior to the Village's exercise of the Right of First Refusal and Option Agreement, Habitat did not allege or complain that the Option Agreement was coerced.

## CONCLUSION

The evidence clearly proved that the Village held an appropriate concern for the harmful effects of a heavy concentration of low-income housing, particularly in light of the presence of such housing in the immediate area. The Village's attempt to re-zone the property would not have prevented Habitat from building low-income housing in the Village. Instead, it would have decreased the concentration of such housing - a legitimate government interest.

The Village's actions regarding the Option Agreement and the enactment of the ordinance which exercised that option were also reasonable and, therefore, a constitutional exercise of its authority in the protection of this legitimate government interest.

The execution of the Option Agreement was proven to be the result of extensive negotiations, give and take, and arms-length bargaining between Habitat and the Village. Habitat freely and voluntarily chose to resolve the dispute in this manner rather than litigate the constitutional issues it now asserts.

10

IT IS THEREFORE ORDERED that judgment be entered in favor of defendant, VILLAGE OF GLENDALE HEIGHTS.

Dated: March 20, 2002

JOHN W. DARRAH
United States District Judge